訴狀

Good morning to you

The following is a description of the case

Plaintiff 1: HOUHE ZENG

Plaintiff 2: DIYUN WANG

Defendant 1: Texas City Fire department
Defendant 2: Texas City Mayor
Defendant 3: AlliedTrust insurance Co.
Defendant 4: Firemark insurance agency
Defendant 5: Texas Department Insurance
Defendant 6: Texas governor office
Defendant 7: 23district senator Terri Leo Wilson
Defendant 8: 12district Senator Mayes Middleton
Defendant 9: 14district Congressman Randy Weber
Defendant 10: Texas General Investigating Committee

United States Courts
Southern District of Texas
**F I L E D**

JUL 3 0 2024

Nathan Ochsner, Clerk of Court

Time of incident: 2021/3/31
Cause of the accident: Unattended cooking, Protein-based smoke, forgetting to turn off the heat when cooking meat broth, burning at high temperature for 5-6 hours;
Claim to insurance company: 2023/03/09 (Day 709)
Time limit for claiming from insurance company: 720 days
Claim result: Rejected
Length of time seeking help: One year

Description of the particularity of the case:
There are significant differences between protein fires and ordinary fires: even if there is no open flame, a large amount of smoke residues invisible to the naked eye and a variety of first-level carcinogens will be produced. Over time, the smoke will evolve into a strong and strange rancid smell. The protein residues form Air pollution sources swirl around all spaces and seep into ceilings/cabinets/furniture/ventilation ducts/clothes...in short, everywhere.

American houses are based on earthquake-proof and economic principles. The interior of the house is composed of drywall, insulation cotton, and wooden frames. Three years later, the plaintiff's home is still filled with the smell of smoke, stink, and mold, even in the garage.
Without professional cleaning, the odor that has not been removed has completely penetrated into these building materials, so they can only be dismantled and replaced with new ones, including air conditioning ducts and hosts.

Harm to human body:
Long-term inhalation of smoke formed by a mixture of harmful fine particles and toxic gases will cause sensitivity/inflammation/swelling of the respiratory tract and lungs, which will then affect oxygen

absorption. People with low immunity or who suffer from asthma/emphysema There is a risk of permanent respiratory damage.

Burning carbohydrates and fats at high temperatures for a long time will produce polycyclic aromatic hydrocarbons (PAHs), which are carcinogens. (Polycyclic Aromatic Hydrocarbons, PAHs)

Burning proteins and carbohydrates at high temperatures - the products of the Maillard Reaction (Maillard Reaction Products)

Menard reaction, also known as non-enzymatic browning reaction, easily occurs in any food containing amino acids and carbohydrates at high temperatures. At this time, brown polymers and many other substances will be produced on the food. Chemical substances, including mutagenic substances and various primary carcinogens.

Cooking protein foods at high temperatures—Polycyclic Aromatic Amines (PAA)

Amino acids in proteins, such as tryptophan, will produce nitrogen-containing heterocyclic compounds (nitrogen-containing heterocyclic compounds) when heated. High temperatures will produce primary carcinogens polycyclic aromatic amines PAA (nitrogen-containing heterocyclic compounds). compound). Tryptophan can also be metabolized by intestinal bacteria into indole, which can be metabolized by the liver into indole acetic acid (uremic toxin) and combined with protein for circulation in the body. People with renal impairment will not be able to successfully excrete toxins in the body's urine. , toxicity will cause damage to multiple vascular systems and kidney tissues throughout the body.


Reasons and reasons for filing the complaint:


Defendant 1:

The Texas City Fire Department's external firefighters lacked professional training, made wrong judgments and records, did not ask the plaintiff to sign for confirmation, and gave wrong instructions to the plaintiff, which resulted in the plaintiff not being able to claim compensation immediately. Although the fire record was updated, the insurance company did not accept it. Get a copy of the fire report from the fire department is very important: A fire report is vital for your claim. This document will provide the time and date of the incident, the areas it affected, the extent of the damage and the source of the fire.


The defendant refused to actively cooperate with the plaintiff in providing concrete fire records to seek compensation from the insurance company on the grounds that the negligent party had been fired.

The plaintiff filed a lawsuit against the defendant for infringement of the plaintiff's life/property rights under the Texas Tort Claims Act.


Demand money damages compensation:$500000;

Demand bodily injury $1000000;

Demand property injury compensation$200000;

Defendant 2: The Texas City Mayor and the City Council attempted to use their power to cover up the Texas Fire Department's negligence and asked City lawyers to send a warning letter to the plaintiff. His deliberate corruption seriously violated the plaintiff's life/property rights.

Demand money damages compensation:$500000;

Demand bodily injury $1000000;

Demand property injury compensation$200000;

Defendant 3:

Allied Trust Insurance Company, a model of an insurance company that maliciously refuses to claim compensation. No insurance contract, no service, malicious denial of compensation. After receiving the claim, they sent a painter to show off (only a flashlight and a 6-foot ladder ended in 5 minutes, and the room was over 22 feet high) and made 100% identical records to the Texas City Fire Department as the reason for rejecting the claim. The fact that the soup pot was cleaned could not prove the fire. However, the plaintiff did not provide a list of losses and could not prove that the replacement of furniture was due to fire or other reasons and refused compensation. The person in charge refused to respond to the plaintiff's invitations to conduct on-site investigations many times. Even after the Texas City fire department updated the original fire alarm records to indicate that the source of the fire may have caused the odor, AlliedTrust still hired a lawyer to insist that their inspection results were correct and refused to compensate.

The plaintiff filed a claim against the defendant for bad faith insurance denial under the Texas Insurance Code smoke damage claim for three times.

The defendant did not provide an insurance contract after the contract was signed, and TDI did not forward it until the claim was filed. There was no guarantee that the company had not deliberately changed the compensation conditions.

The plaintiff resisted any unreasonable terms.

Demand money damages compensation:$1500000;

Demand bodily injury $3000000;

Demand property injury compensation$1100000;

Defendant 4:

Firemark Insurance Agency has no insurance contract, no services, and no assistance. Even though the company is only 45 minutes away from the plaintiff's home, the defendant still repeatedly refused to respond to the plaintiff's invitations to conduct on-site investigations. Malicious refusal to compensate.

The plaintiff filed an three times allegation against the defendant for malicious insurance denial under the Smoke Damage Claims Regulations of the Texas Insurance Code.

The defendant did not provide an insurance contract after the contract was signed, and TDI did not forward it until the claim was filed. There was no guarantee that the company had not deliberately changed the compensation conditions. The plaintiff resisted any unreasonable terms.

Demand money damages compensation:$1500000;

Demand bodily injury $3000000;

Demand property injury compensation$1100000;

Defendant 5:

Texas Department Insurance (TDI) is unprofessional, has no service spirit, is seriously derelict in its duties, is extremely corrupt, maliciously racially discriminates against the plaintiff, and maliciously frames the plaintiff in an attempt to prevent the plaintiff from seeking help and claiming compensation. Refuses to make any response to the Texas City Fire Department's business negligence and the insurance company's evasion of business failures and responsibilities in this case. It resolutely denies that its subsidiary Texas State Fire Department has any relationship with the Texas City Fire Department. It has repeatedly refused to respond to the plaintiff's invitations to conduct on-site investigations. , he did not hesitate to lie to the Chinese members of other districts, saying that the plaintiff's claim period had expired, and the plaintiff just wanted to aggravate the situation. What is the defendant's underlying motive for framing the plaintiff? Please give the plaintiff a reasonable explanation.

The defendant responded by citing Section 92 of the Texas Code of Civil Procedure and submitted administrative immunity protection to the Texas Attorney General. The plaintiff protested based on the Texas Tort Claims Code, TEX.CIV.PRAC.&REM. Legislative Practices and Remedies: Code.101.0215 clearly stipulates government functions: (1) Police, fire and control. Article 36 includes, but is not limited to, the waiver of immunity. Code 101.055(3) Method of providing police/fire protection refers to a governmental decision on how to provide police or fire protection, and courts may hold that governmental entities do not bear the responsibility for policy development but must bear the responsibility for enforcement.

Partial immunity (qualified immunity) and official immunity (legislative immunity/executive immunity) are different, but the common premise is that (1) the government actor exercises its discretion fairly and impartially;

(2) The behavior is in good faith;

(3) Within the scope of its duties;

The Texas Supreme Court provides partial immunity protection for actions taken in good faith and discretion by an officer or employee within the scope of his or her authority.

As an elected paid official, no one has a privilege.

Judging whether the exemption protection is bona fide is based on complete facts, which is also the basis for the court's discretion in litigation.

Code.101.057 provides that immunity cannot be used by government entities or individuals if the infringement was entirely intentional and not negligent.

The plaintiff asked the defendant to provide factual evidence on the reasonableness of its application for immunity protection.

The plaintiff filed a malicious tort claim against TDI based on Chapter 6 of the U.S. Federal Civil Rights Act.

· Demand money damages compensation:$500000;
Demand bodily injury $1000000;
· Demand property injury compensation$200000;


Defendant 6:
Office of the Texas Governor
The defendant denied the charges under Section 92 of the Texas Code of Civil Procedure, asserted sovereign immunity, and retained special immunity.

The defendant has been the chief executive of Texas for eight years. Mr. Greg has long acquiesced in his office staff's malicious intimidation/deliberate indifference/serious malfeasance/racial discrimination against the plaintiff. Mr. Greg and his senior staff in the office, Pate Gardner, blocked the plaintiff's email, and office policy staff Sara Hays declined to comment on the facts. Office manager Marie Dahlmann did nothing. Even after learning that the plaintiff had gone to the governor's office twice for help, she still allowed ATF and security to search the plaintiff/confiscate property, expel the plaintiff, and give him a warning. Many illegal/unconstitutional behaviors have caused the plaintiff and his family to suffer longer-lasting physical and mental pain and high-risk cancer stress. There is no personal respect for the plaintiff and no humane care. What they show is the dictatorship of a totalitarian state and its disregard for the people's rights. .

The plaintiffs argued to strike out Mr. Greg's executive immunity from holding the governor's office. The plaintiff brought a malicious tort claim against the defendant under the Texas Tort Claims Act. The plaintiffs brought a malicious tort claim against Mr. Greg and the Governor's Office under Title VI of the U.S. Federal Civil Rights Act.
Demand money damages compensation:$500000;
Demand bodily injury $1000000;
Demand property injury compensation$200000


Defendant 7:
23rd district Senator Terri Leo Wilson
Ms. Terri used the Texas Code of Procedure to deny the charges on the basis of no financial gain, filed for legislative immunity with the Texas Attorney General, requested financial assistance, and retained special immunity.

As a member of the Galveston District Council in Texas, Terri girl's Galveston office never answered the phone, and the Austin office did not provide any response after learning about the incident. The plaintiff's family had no recourse and fell into despair.

The U.S. Constitution divides the country into three parts: legislative/judicial/executive. Members represent the people. All other regional councilors, including John Cornyn, asked us to seek help from the regional councilors after hearing about this.

The plaintiff requested the defendant to prove the reasonableness of its legislative immunity under the Texas Tort Claims Act. If there are special exemptions, please provide evidence.
Demand money damages compensation:$500000;

Demand property injury compensation$200000

Defendant 8:

District 12 Senator Mayes Middleton

At present, the congressman has hired a lawyer to respond. The first mediation time of the small claims court is 9:30 am, April 22, 2024.

Demand money damages compensation:$500000;

Demand bodily injury $1000000;

Demand property injury compensation$200000

Defendant 9:

Randy Weber, Congressman of Texas 14th District

Mr. Randy declined to help that the case did not involve a federal issue,and transferred the case directly from the Galveston Small Claims Court to the Federal Court, Southern District of Galveston, where Magistrate Andrew M. Edison was assigned to conduct the Video trial.CIVIL ACTION No.3:24-cv-00072

Federal district courts have jurisdiction to hear any case that Congress may designate by law. However, no member of Parliament can designate a judge to hear specific cases.

Therefore, Sheriff Andrew is asked to recuse himself from this case.

The defendant requires the plaintiff to prove an interest relationship.

How can an interest relationship be established between the plaintiff, who is a disadvantaged group in society, and the defendant, who is a national legislator, apart from giving and receiving bribes? Only by establishing a relationship of interest can we provide services to ordinary residents? Is this why TX's oil companies gets Mr. Randy's attention?

Congressman do not represent the people from beginning to end?

The plaintiff relied on the Texas Tort Claims Act CODE.101.051, CODE.101.052, CODE.101.055, CODE.101.057

The plaintiff brought an allegation of malicious omission and a tort claim against Congressman Randy under the Act.

The law clearly stipulates: Any act or omission of the legislature or a member of the legislature acting in his or her official capacity or to the legislative functions of a governmental unit.Id. No immunity can be obtained on the basis of good faith and reasonable response.

Demand money damages compensation:$500000;

Demand bodily injury $1000000;

Demand property injury compensation$200000

Defendant 10:

Texas General Investigation Commission

As the department that supervises civil servants in Texas, this agency is composed of three Republican senators and two Democratic senators. According to media reports: In 2023/5, this agency unanimously passed the impeachment of Texas Attorney General Ken Paxton for his serious corrupt personal behavior.

But Mr Paxton was later able to retain his position as an elected official through arguments by two senior lawyers.

After receiving this case from the Texas General Investigation Commission, the plaintiff did not receive any response, so he contacted all member offices of the agency, but still received no response.

Plaintiffs brought charges of malicious omission and tort claims against the agency under the Texas Tort Claims Act.

Demand money damages compensation:$500000;

Demand bodily injury $1000000;

Demand property injury compensation$200000

Insurance is a safety net for homeowners, providing financial protection against unforeseen events. As a state government department, there is no ethics and abuse of power.

None of the eight Texas government departments is responsible for this. How does the Texas government protect people's lives and property through public power?

How can Texans be solved?

List of plaintiff's damage:

① Past physical damage: complete loss of sense of smell;

② Past mental damage: suffering from long-term mental stress, insomnia, depression and bipolar disorder;

③Past physical damage : multiple occurrences of swollen lymph nodes and pain in the armpits and neck;

④ Past physical damage: repeated inability to urinate;

Past reasonable and necessary medical expenses;

Future probably reasonable and necessary medical expenses;

⑤ Compensation for house smoke damage;

⑥ Past lost earnings and Future probable lost earnings;

⑦ Compensation for the cost of replacing furniture throughout the house;

⑧ Past physical pain and suffering and mental anguish;

Future probable physical pain and suffering and mental anguish;

⑨ Past and future property damage and losses;

⑩Attorney fees and pre-judgement interest and post-judgment interest and Court costs.

This case has been delayed for 3 years. Please the judge to handle it seriously and quickly!



# The State of Texas
Secretary of State

2024-361731-1

I, the undersigned, as Secretary of State of the State of Texas, DO HEREBY CERTIFY that according to the records of this office, a copy of the Citation and Petition in the cause styled:

Hou He Zeng vs Allied Trust Insurance Company
Justice Court, Precinct 2, Galveston County, Texas
Cause No: 24NSC020034

was received by this office on February 27, 2024, and that a copy was forwarded on March 19, 2024, by CERTIFIED MAIL, return receipt requested to:

Allied Trust Insurance Company
Allied Trust Insurance Company, Registered Agent
4200 West Cypress St
Tampa, FL 33607

As of this date, no response has been received in this office.



Date issued: May 22, 2024

Jane Nelson
Jane Nelson
Secretary of State
GF/mr

**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

---

Washington, DC 20226
www.atf.gov

406040: ADW
3450

APR 0 4 2024

**<u>FEDEX</u>**

Di Yun Wang
7919 Quartz Ln
Texas City, TX 77591-1504

| | |
|---|---|
| Agency Case Number: | 24-06481 |
| Asset Identification: | See Attached |
| Asset Description: | See Attached |

Dear Mr. Wang:

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) received a copy of your Claim for Seized Property (Claim) and your Petition for Remission or Mitigation of Forfeiture, (Petition) dated April 2, 2024. If you do not receive a written response within 120 days regarding the final decision of your Claim and/or Petition please email the Asset Forfeiture & Seized Property mailbox OM-AFSPD-LRT@atf.gov.

Sincerely,

Asset Forfeiture and Seized Property Division
Bureau of Alcohol, Tobacco, Firearms and Explosives

 **Gmail**

JANE TS <jts990616@gmail.com>

**Case No.3:24-MC-00013**

TS Jane <jts990616@gmail.com>

4月3日 週三 下午2:53

收件者： <george_cardenas@txs.uscourts.gov>

About Protein Fire Smoke Damage

What is a Protein Fire Smoke Damage?

We have been exposed to this high risk carcinogenic environment for three years, please save us!Please!!!Be Quick!!!Thx!!!!

HOUHE ZENG FAMILY

April 3 2017
We have seemed to have had an influx of protein fires lately and I wanted to give you some good information on what they are and how to handle them.

A protein fire is caused when a resident is cooking eggs or meat with oil and forgets it is cooking.  When the protein gets hot and overheats, it puts a sticky, white smoke in the air and leaves a clear residue that is hard to see and smells really strong.  People tend to react by turning on exhaust fans in the kitchen and bathrooms.  This puts that sticky residue through the components of the fans and motors and needs to be taken apart to clean.  The smell can really irritate your sinuses and throat within an hour.

These are some steps that you can do in the first couple days to clean up a protein fire.

1. First, put a hepa air scrubber in the unit to get that environment as clean as possible.  Air is filled with particulates that you can't see. Recirculate and clean the air!
2. Then, have a cleaning crew clean everything in the unit.  This includes, walls, ceilings, floors, doors, door casings, baseboards and inside cabinets. Use chem sponges on the ceilings as they are harder to clean.
3. Lastly, ozone or hydroxyl the air and pressurize the unit.  This will put product into the wall cavities without opening them up, electrical outlets and any other crevasse that can't be gotten to.
WHAT YOU NEED TO KNOW ABOUT PROTEIN SMOKE DAMAGE

When you think of house fires, you think big black billowing smoke filling the air as a beautiful home crumbles to ashes. Thankfully, that is not always the case. Most commonly, house fires leave a big mess but leave the house standing. Though your house may not crumble to ashes, the damage left is nothing short of disastrous.
According to the National Fire Protection Association, 66% of all house fires start with food or other cooking essentials catching fire. Kitchen fires are a nasty business, sometimes more than the victim realizes. Cooking fires can leave a residue called protein smoke. Protein smoke is nearly invisible and very greasy; it is the ultimate hot mess.

THE WRATH OF PROTEIN SMOKE
Once a protein fire is controlled most home-owners will be relieved by the apparent lack of destruction – but oh, how wrong they are. Protein smoke is tricky. It will sit on your walls and unleash its wrath of destruction all while you haven't a clue. It will start to break down the structure of your home. The nature of this type of smoke will start to break down the integrity of paint, destroy varnishes, and not to mention the smell.
Nothing ruins a house party more than a wretched smell. The odor will not be easy to get rid of either. The longer the film sits, the more the odor will spread. It will travel through the air ducts and fill your entire home. This will make it harder to pinpoint the problem to get it under control. Often times during cleanup the air ducts have to be addressed as well. Just when you thought you conquered the battle with fire, protein smoke comes to try and win the war.
HOW PROTEIN SMOKE IS BORN
Like I mentioned before, cooking fires make up a huge percentage of fires in the home. Now, you can almost always source a house fire down to human error. Kitchen and cooking fires usually have the same nasty accomplice: grease. The protein smoke residue is made up of a mist of animal fat. This mist is created by a low heat fire quickly turning your meal into an airborne mess.

WHY YOU NEED THE PROS

• A lot of fires leave behind piles of soot, ash, and blackened walls. Protein fires are just the opposite, that's what makes them such a nuisance. If this happens to you, you might think you can tackle the mess alone. Truth is, this is a mess NO ONE should have to tackle alone. The residue left behind is too tricky and needs the expertise of a professional.

Watch Out for This Specific Type of Kitchen Fire
• View Larger Image

No homeowner ever anticipates or welcomes a fire within their abode. Yet, understanding that not all fires are created equal can be crucial. Among the array of fire-related challenges, one stands out: the enigmatic "protein fire."
A protein fire, typically ignited in the kitchen during the preparation of protein-rich dishes, presents a distinct set of difficulties. What sets it apart? The answer lies in the residue it leaves behind.
The Unseen Culprit: Residue from Protein Fires
Unlike more straightforward fires, a protein fire may seem deceptively mild initially. It starts innocuously as you cook your meal, but beneath the surface, a stealthy transformation occurs. The fire chars your food, leaving a nearly invisible film of residue on surfaces throughout your kitchen. It's this invisible cloak that makes protein fires especially problematic.
The telltale sign of a protein fire emerges when you touch any surface in the room. That sticky, invisible deposit instantly gives away the fire's presence. To compound the issue, the odor resulting from a protein fire is not your typical burnt scent; it's more insidious and considerably more challenging to banish from your home.
Specialized Expertise Required
Here's the bottom line: Cleaning up after a protein fire necessitates specialized training and equipment. It's not a task for the faint of heart or the average homeowner.
Preventing Protein Fires
Prevention is the most effective strategy when dealing with protein fires. Here are some crucial tips to keep in mind:
1. Follow Cooking Instructions: Always adhere to recommended cooking temperatures and times. Accuracy in your cooking process can prevent fires.
2. Use Recommended Techniques: Employ the recommended cooking techniques for the dishes you're preparing. These guidelines are there for a reason – to ensure safe cooking practices.
3. Stay Vigilant: Keep a watchful eye on your food as it cooks. Avoid leaving your home, taking lengthy showers, or getting engrossed in TV shows without periodically checking on your meal.
4. Guard Against Grease Splatter: Use appropriate guards to prevent splashing grease, which is a common culprit in protein fires.
5. Grill Safely: When grilling outdoors, follow all recommended safety measures to protect your porch or deck from potential damage.
6. Keep a Fire Extinguisher: Maintain a fire extinguisher in your kitchen as a last resort. In case of the worst-case scenario, having a fire extinguisher on hand can make a critical difference.
Responding to a Protein Fire
Should you find yourself dealing with a protein fire, follow these steps:
Contact Your Insurance Company. Notify your insurance provider to understand your coverage limits and requirements.
Seek Professional Help. Reach out to experts in fire damage restoration like us. We can assess the aftermath, determine salvageable items, recommend disposal if necessary, and guide you through the cleaning and restoration process for your kitchen.
In the realm of fires, protein fires stand as unique challenges, requiring specialized attention. Prevention remains the best strategy, but should you encounter one, professional assistance is essential to restoring your home and peace of mind.

Understanding Smoke Damage: Wet Smoke, Dry Smoke, and Protein Residue Smoke
Zack Klein • Oct 18, 2023
Dealing with the aftermath of a fire can be an overwhelming and challenging experience. Besides the obvious damage from flames, smoke damage is a significant concern for homeowners and business owners. Smoke can leave behind different types of residue, each with its own set of challenges when it comes to cleaning and restoration. In this blog post, we'll break down the three primary types of smoke damage: wet smoke, dry smoke, and protein residue smoke, so you can better understand the unique characteristics of each and how to address them.

Wet Smoke Damage
Wet Smoke damage occurs when a fire burns slowly at a low temperature. It typically produces thick, sticky, and pungent smoke that has a unique set of challenges for cleanup and restoration. Key characteristics of wet smoke damage include:
• Residue: Wet smoke leaves behind a sticky, smeary residue that can be challenging to clean. It often has a yellowish or brownish color and a strong, unpleasant odor.
• Surface Affinity: Wet smoke tends to adhere to surfaces and can penetrate porous materials deeply.
• Odor: The strong, lingering odor of wet smoke can be difficult to eliminate.

Due to the adhesive nature of wet smoke residue, specialized cleaning techniques and professional restoration services are often necessary to effectively remove it from affected areas.

### Dry Smoke Damage

Dry Smoke damage results from fires that burn quickly at high temperatures, consuming materials rapidly. It produces a fine, powdery residue that can seem less damaging at first glance but poses its own set of challenges. Key characteristics of dry smoke damage include:

• Residue: Dry smoke residue is fine and powdery, often appearing gray or black. It can easily smear and become embedded in surfaces.
• Surface Affinity: Dry smoke can affect a wide range of surfaces and materials but is less likely to penetrate deeply compared to wet smoke.
• Odor: While dry smoke residue may not be as pungent as wet smoke, it can still produce a noticeable, lingering odor.

Cleaning and restoration of dry smoke-damaged areas typically involve dry cleaning techniques, HEPA vacuuming, and specialized cleaning agents designed to remove the fine, powdery residue effectively.

### Protein Residue Smoke Damage

Protein Residue Smoke damage occurs when proteins found in food, meat, or other organic materials are burned. It often results in nearly invisible but highly pungent residue. Key characteristics of protein residue smoke damage include:

• Residue: Protein residue is nearly invisible and can be challenging to detect. It often leaves behind a yellow or amber-colored film that may not be immediately visible.
• Surface Affinity: This type of smoke residue tends to cling to surfaces and can be difficult to remove without proper cleaning methods.
• Odor: Protein residue smoke often produces a strong, lingering odor that can be difficult to eliminate.

Effective removal of protein residue smoke often requires specialized cleaning solutions and techniques designed to break down and remove the invisible film and combat the associated odor.

### Professional Restoration for Smoke Damage

Understanding the different types of smoke damage is crucial for effective cleanup and restoration after a fire. Each type presents unique challenges, from sticky, adhesive residue to fine, powdery deposits and nearly invisible films. In many cases, it is advisable to seek professional assistance from restoration experts who have the knowledge and experience to assess the damage accurately and employ the appropriate techniques and products to restore your property to its pre-fire condition. Remember, prompt and thorough smoke damage restoration is essential for ensuring the safety and comfort of your home or business.

At Guarantee Restoration, our teams of licensed experts work closely with clients across the Gulf South to erradicate the lingering effects of fire and smoke damage and fully restore their properties to their original condition. With specialized training, decades of experience, and state-of-the-art equipment, we ensure that no stone is left unturned in the process of returning your property to a space that is beautiful, safe, and functional.

# After the Fire: Arson investigators battle cancer risks after years of duty

**Published** July 31, 2019 10:26pm CDT    FOX 9 Minneapolis-St. Paul

**(FOX 9)** - As the Fire Marshal for St. Cloud, one of Phil Schaefer's duties is to investigate the cause of any fire.

He sifts through the still smoldering, charred remains of a fire with the air still thick with soot, to determine whether it's an accident or arson.

"To me, the worst part of the fire is when the fire is out," Schaefer said.

What remains of the burned debris could still be emitting a variety of gases, a toxic soup of

carcinogens that hangs in the air.

Schaefer said he always wore some type of protective gear to fire scenes, yet nothing could've prepared him for the news he received in January of 2018.

"The doctor came into the room," Schaefer recalled. "I knew it was bad, he said, 'I know you have cancer.'"

He was diagnosed with multiple myeloma at 54, a spot on his spine and another on his ribs.

It's the second leading cause of cancer among firefighters.

When Schaefer ran out of sick and vacation time during his treatments, other firefighters donated theirs.

"They have done things they didn't have to do," Schaefer said. "It is great what they did, they know what our family is going through, it's been wonderful, from the chief down to the firefighters."

Schaefer is not alone in his cancer fight.

Dave Gustafson has been with the Golden Valley Fire Department for 28 years. For half that time, he also worked as a supervisor for the Hennepin County Fire Investigation Team.

Doctors diagnosed him with leukemia.

"Because I have family at home, that was my first thought, 'How am I going to take care of them, how am I going to be here for my kids and wife?'" Gustafson said.

Sean McKenna worked as an arson investigator with Minneapolis police for 22 years. He retired earlier this year, after oncologists discovered his cancer two years ago.

"There's no family history of non-Hodgkin's lymphoma or leukemia in my family, and I think my years on fire scenes is responsible," McKenna told the FOX 9 Investigators. "The tough part of this diagnosis is it never goes away, and it might someday kill you."

## GREATER CANCER RISK FOR INVESTIGATORS

Sixty-one percent of all career firefighters have died from cancer, according to a self-
reported survey by the International Association of Firefighters

A study by the Centers for Disease Control found firefighters have a 14% greater chance of dying from cancer than the general public.

Firefighters are at a statistical greater risk for testicular cancer (102%), multiple myeloma (53%), non-Hodgkin lymphoma (51%), skin (39%), brain (32%), prostate (28%), stomach (22%) and colon (21%), according to the Journal of Occupational and Environmental Medicine.

International Association of Arson Investigators' Jeff Pauley said the cancer risk for fire investigators is even greater than it is for firefighters. He helped write a white paper that describes the best practices for cancer prevention when it comes to fire investigators.

"They have generally, for the last 20 years, been less protected," Pauley said. "For so many years, the prevalent thought among fire investigators was once the fire is out everything is good."

Under pressure to get into a scene as soon as the fire is out, he said investigators will often go without breathing apparatus or other protective gear.

"We are at more fires than the average firefighter and we are there longer than the average firefighter, and sadly at this point, less protected," Pauley said.

"Going on to a scene days later and kicking up this soot, it's no longer being consumed by a heat source, and it's toxic," McKenna said. "Many investigations are simply shovel festivals."

## CANCER RESEARCH STARTS FOR INVESTIGATORS

Research at the University of Miami and elsewhere is focusing on fine particulate matter, microscopic soot from what's known as incomplete combustion, all the toxins the fire didn't burn.

The Federal Emergency Management Agency provided a grant to the University's Sylvester Comprehensive Cancer Center to study how firefighters get cancer, and now the researchers are expanding the study to include fire investigators.

The study will interview participants and research the impact of fire scenes on them. While looking for a fire cause, investigators will wear silicon wristbands which will capture post fire particles, along with special wipes to collect what gathers on skin. Blood, urine and saliva

tests will also be taken before, during and after investigations.

Results are years away.

The Bureau of Alcohol, Tobacco, Firearms and Explosives - which is the only federal agency that investigates fires - is also looking at a cancer link after a number of its fire investigators developed bladder cancer over the last two decades.

The agency has now invested heavily in respirators, monitors and protective clothing.

**TAKING PRECAUTIONS**

"The science for firefighters is coming along, unfortunately the science for the post fire environment is next to nothing, we are working to change that, lots of irons in the fire but nothing now," Pauley said.

Until there are answers, Dave Gustafson takes every precaution he can, as do his fellow firefighters in Golden Valley.

He wears breathing equipment when he is inside a fire scene. After his work is finished, he uses a decontamination station, and wipes down his equipment and showers. Back at the station, he quickly showers to get soot off his body, and he has an extra set of turnout gear while his original gear is getting cleaned in a specialized washing machine, known as an extractor.

"If I can keep this from happening to someone else that would mean the world to me," Gustafson said. "In addition, I am a lot more cognizant that, 'Hey I need to be looking out for myself.' Again, it goes back to my family I want to be here for them."

# 9/11 Cancer Study

## Blood Cancer Precursor Found in 9/11 Firefighters

April 26, 2018—(BRONX, NY)— A study in today's issue of _JAMA Oncology_ reports that New York City firefighters exposed to the 9/11 World Trade Center disaster site face an increased risk of

developing myeloma precursor disease (MGUS), which can lead to the blood cancer multiple myeloma. The study was conducted by researchers at <u>Albert Einstein College of Medicine</u>, <u>Montefiore Health System</u>, the <u>Fire Department of the City of New York</u> (FDNY) and <u>Memorial Sloan Kettering Cancer Center</u>.



"With our 2011 <u>study</u> in *The Lancet*, we were the first to show that first responders were more likely to get many different types of cancer," said senior co-author <u>David J. Prezant, M.D.</u>, a professor of medicine at Einstein, a pulmonary disease specialist at Montefiore and chief medical officer of the FDNY. "We carried out this new study to do more than just treat cancer. We wanted to find early, predictive signs of cancer that would allow us to screen people and monitor those found to be at risk. By detecting MGUS, which predicts the development of multiple myeloma, we are able to do that."

In MGUS (monoclonal gammopathy of undetermined significance), the blood's plasma cells produce an abnormal protein called monoclonal (M) protein that can be detected with blood tests. MGUS generally causes

David J. Prezant, M.D.

no problems but can progress to multiple myeloma, a blood cancer diagnosed in about 30,000 Americans each year. In multiple myeloma, rapidly proliferating plasma cells can crowd out the bone marrow's normal blood-forming cells, leading to problems including anemia (shortage of red cells) and leukopenia (shortage of white cells). Most multiple myeloma cases are diagnosed in people older than 65, and only 5 percent of cases occur among people under 50. Half of those diagnosed with multiple myeloma are still alive five years later.

Previous studies suggest that MGUS and multiple myeloma all tend to develop after exposure to toxic chemicals. The aerosolized dust from the collapsed towers exposed FDNY and other first responders to unprecedented levels of polychlorinated biphenyls, polycyclic aromatic hydrocarbons, dioxins, asbestos and other potential carcinogens, as well as diesel smoke from heavy machinery used in the 10-month rescue and recovery effort.

For statistical reasons, the study population was limited to 781 white, male WTC-exposed firefighters aged 50 to 79 whose blood samples were evaluated to assess the prevalence of MGUS in the group. When results were compared with MGUS prevalence in a non-exposed comparison group (men living in Olmsted County, MN), the prevalence of MGUS in the firefighters was nearly twice as high (7.63 cases of MGUS per 100 firefighters vs. 4.34 cases per 100 non-exposed persons).

"We saw a significantly higher incidence of MGUS in these first responders, and they're developing it at a young age," said the study's senior co-author <u>Amit Verma, M.B.B.S.</u>, a professor of medicine and of developmental & molecular biology at Einstein and director of hematologic malignancies at the Montefiore Einstein Center for Cancer Care. Their early development of MGUS, he says, suggests that these firefighters potentially face an increased



Indeed, in a separate analysis, the researchers examined the 16 cases of multiple myeloma diagnosed between September 12, 2001 and July 1, 2017 among all white, male WTC-exposed FDNY firefighters. Their average age of diagnosis was 57, or 12 years younger than the average age for multiple myeloma diagnosis nationally.

Although not everyone with MGUS will develop multiple myeloma, the researchers recommend that physicians screen first responders exposed to the WTC site for both conditions. "Screening for multiple myeloma risk by testing for MGUS is something we can offer these first responders, which is why this study is important," said Dr. Prezant.

Another study in this edition of *JAMA Oncology* predicts how many WTC-related cancer cases will be diagnosed among FDNY WTC exposed rescue/recovery workers between January 1, 2012 and December 31, 2031.The study, by Einstein, Montefiore, and FDNY researchers, predicts that among a subset of white males 2,714 new cancer cases will be diagnosed over the 20-year period. Led by Rachel Zeig-Owens, Dr.P.H., a research assistant professor in epidemiology and population health at Einstein, these studies demonstrate that this is a significantly greater cancer burden than the 2,596 cancer cases that would be predicted in a demographically similar but non-exposed population. The study also calculated that the 20-year cost for the first year of cancer treatment for the FDNY WTC exposed rescue/recovery workers will total more than $235 million. The paper is titled "Estimation of Future Cancer Burden in World Trade Center-Exposed Fire Department of the City of New York Rescue/recovery Workers."

The MGUS study is titled "Multiple myeloma and its precursor disease among firefighters exposed to the World Trade Center disaster." The blood samples for this study were collected and purified under the direction of Orsi Giricz, Ph.D., a co-first author of the study at Montefiore/Einstein, and then analyzed for MGUS by Ola Landgren, M.D., Ph.D., at Memorial Sloan Kettering Cancer Center, the corresponding author for the study. Dr. Zeig-Owen was also a co-first author in this study.

*"We saw a significantly higher incidence of MGUS in these first responders, and they're developing it at a young age."*

– Amit Verma, M.B.B.S.

The other Einstein and Montefiore authors are David Goldfarb, M.P.H., George Nwankwo, B.S., Ulrich Steidl, M.D., Ph.D., Kith Pradhan, Ph.D., Charles B. Hall, Ph.D., Hillel W. Cohen, Dr.P.H., Theresa Schwartz, M.S. and Mayris P. Webber, Dr.P.H. Additional authors include Malin Hultcrantz, M.D., Ph.D., Kaznouri Murata, Ph.D., Katie Thoren, Ph.D., Lakshmi Ramanathan, Ph.D., Ahmet Dogan, M.D., Ph.D., and Shani Irby, N.P., all of Memorial Sloan Kettering Cancer Center; Nadie Jaber, PA-C, of the FDNY; and Laura Crowley, M.D. and Michael Crane, M.D., of Mount Sinai School of Medicine.

This work was supported by grants from the V Foundation for Cancer Research, the Byrne by Fund, the Memorial Sloan Kettering Core Grant, the Albert Einstein Cancer Center, and the National Institute for Occupational Safety and Health. The authors declare no competing financial interests.

## M Gmail

TS Jane <jts990616@gmail.com>

**About Rep Terri Leo Wilson defense reply**

TS Jane <jts990616@gmail.com>                                    3月14日 週四 下午7:17
收件者：JP2Civilclerk <JP2Civilclerk@co.galveston.tx.us>， Jacqueline Irwin <Jacqueline.Irwin@house.texas.gov>， OCE
<oce@mail.house.gov>， Texas Attorney General <consumerprotection-complaints@texasattorneygeneral.gov>，
<ali.thorburn@oag.texas.gov>， <andrew.harkey@house.texas.gov>， <mailbox_office@ethics.senate.gov>，
<michelle.norred@oag.texas.gov>

Good Afternoon!

Please respond to Representative Terri Leo Wilson's defense and conclusion.
I'm not so understanding what does that mean.
I am currently not a U.S. citizen but have political asylum status. My English really sucks!
I have lived in Houston for 5 years and Texas City for 3 years. I live seriously and work hard to make money to pay taxes.
Our house suffered a fire accident in 2021.
The firemen were unprofessional and the Texas City's Mayor protected them.
Insurance companies and insurance agency didn't issue insurance contracts.
The TX governor office pushed us to TDI. Both the governor's office and TDI racially discriminated against me, blocked
our case without justifiable reasons, even lied to legislators from other districts in an attempt to frame me.
 I can't find a lawyer, Texas government civil servants are wasting too much of our time.
In this situation, should I, as residents (not citizens), turn to our MP for help?
 If legislators don't protect us, who will?
If the MP believes she is innocent, ask for reasonable legal proof.
We don't want to drag innocent people into the water because this incident has harmed our whole family, but it would be
terrible if a government department was corrupt or inactive!

We need people to coordinate and deal with it as early as possible across departments, rather than sweeping the
trouble by yourselves.

We sincerely invite you to come to our home to smell the odor on site. If your attitude towards handling it is positive,
obviously this method is also the most original and effective.
 Right or wrong is up to one's heart!
Who are responsible, you can use your power to push it instead of complaining here!
Our goal is to find out who is really responsible and who is behind the scenes.

HOUHE ZENG
Mar14,2024



# Texas House Member

Browse by District: (#  ⊙)  Member: (member select  ⊙)

**Rep. Leo-Wilson, Terri**
**District 23**

[Email]

**Capitol Address:**
Room E2.720
P.O. Box 2910
Austin, TX 78768
(512) 463-0502

**District Address:**
305 21st Street, Suite 241,
Galveston, TX 77550
(409) 762-0202

**Bills Authored/Sponsored 88th Legislature:**
Authored (including Joint)
88(1) 88(2)
Co-Authored 88(1) 88(2)
Sponsored (including Joint)
88(1) 88(2)
Co-Sponsored 88(1) 88(2)

**Committees:**
Juvenile Justice & Family Issues
Pensions, Investments & Financial Services

**District Analyses:**
District Profile Reports
Population Analysis
School Districts
Cities and CDPs
Precincts within Districts
Election Analysis
ZIP Codes by District

**Counties Represented:**
Chambers, Galveston (part)

**District:**
District Map

Biography
Media
Newsletters
Press Conference

## Biography

[Spanish version]

Terri Leo-Wilson graduated Summa Cum Laude with undergraduate degrees in Elementary and Special Education, and received a Master's Degree in Educational Administration from Texas A&M University Commerce. She is retired having been a Teacher, Case Manager, and Department Administrator for middle school students with special needs in Texas public schools. Terri was elected to three terms on the State Board of Education (SBOE) where she served without pay or staff, serving approximately 2 million constituents. While on the SBOE, she served as the Vice Chairman of the Board, Chairman of the Instruction Committee and as Chairman of the Texas State Teacher of the Year Selection Committee. For Terri's work on writing curriculum ensuring that students understood the benefits of the free-enterprise system, she received the The American Exceptionalism Award from Americans for Prosperity. As a conservative leader and stalwart on the SBOE, Terri received the Faithful Servant Award from the US Pastor's Counsel, Protector of the Family Award from the Foundation for Life, and the Texas Family Advocate of the Year Award from Concerned Women For America.

Terri Leo-Wilson has been a grassroots activist in Texas for 40 years. In that time Terri has spent countless hours in Austin promoting the Republican Party of Texas Platform and Legislative Priorities to legislators, both on and off the State Republican Executive Committee. Since 1984, Terri has been a delegate/alternate to all but one Texas State Republican Convention and has been to three National Conventions. Terri was a TFRW Tribute to Women Honoree and was a past recipient of the Texas Star Award from the Texas Women's Alliance. Terri has served in numerous positions in the Republican Party. She has been a Precinct Chairman, Senatorial District Chairman, Co-Chair of the RPT Election Integrity/Poll Watcher Recruitment Project, a member of the Early Voting Ballot Board and Signature Verification Committee, and she has chaired numerous State Convention Committees, including the Chairman for the National Nominations Committee. Terri was a founder of a thriving TFRW club.

Terri has a wealth of leadership experience in bringing people together in healthy discourse and has been frequently called

48

upon to speak on educational issues and grassroots politics. Terri and her husband Dave have five children and four grandchildren. Terri's House District 23 includes all of Chambers County and part of Galveston County. She currently serves on the Juvenile Justice & Family Issues and Pensions, Investments, & Financial Services committees.

# Media

## Archived Photo Gallery

State Representative Terri Leo-Wilson takes the Oath of Office surrounded by her family during the Opening Day Ceremony.

  

# Member Press Releases

## February

**02/28/2023**
**State Representative Leo-Wilson Files Legislation Protecting Educators' Religious Liberty**
by: Rep. Leo-Wilson, Terri

**02/21/2023**
**Representative Leo-Wilson Tackles Texas' Fentanyl Crisis**
by: Rep. Leo-Wilson, Terri

**02/16/2023**
**Honorary Page Program Open to Galveston & Chambers County Students**
by: Rep. Leo-Wilson, Terri

**02/10/2023**
**Representative Leo-Wilson Announces start of Postcards to Space Competition**
by: Rep. Leo-Wilson, Terri

**02/03/2023**
**Rep. Terri Leo-Wilson Files Public Education Reform Bills**
by: Rep. Leo-Wilson, Terri

## January

**01/31/2023**
**Texas House Files Budget for Fiscal Biennium 2023-2024**
by: Rep. Leo-Wilson, Terri

**01/31/2023**
**PUC Asks Texas Residents to Report Local Electricity Outages**
by: Rep. Leo-Wilson, Terri

**01/31/2023**
**Entergy and Rep. Leo-Wilson to Host Town Hall Regarding Bolivar Peninsula Power Outages**
by: Rep. Leo-Wilson, Terri

**01/20/2023**
**State Representative Terri Leo-Wilson Attends Gubernatorial Inauguration Festivities**
by: Rep. Leo-Wilson, Terri

**01/13/2023**
**State Representative Terri Leo-Wilson Takes Oath of Office**
by: Rep. Leo-Wilson, Terri

# Newsletters:

2023 Newsletter 08.15.2023.pdf

2023 Newsletter 08.15.2023 (Landscape View).pdf

JOHN CORNYN
TEXAS

# United States Senate

WASHINGTON, DC 20510–4305

December 18, 2023

Ms. Jane Tseng
7919 Quartz Lane
Texas City, Texas 77591

Dear Ms. Tseng:

Thank you for your letter regarding your difficulties with the Texas Department of Insurance. I would like to be of assistance, but it appears that this matter is within the jurisdiction of the state rather than the federal government. Therefore, I have referred your correspondence to your State Senator, the Honorable Mayes Middleton.

I appreciate having the opportunity to represent you in the United States Senate. Thank you for taking the time to contact me.

Sincerely,

JOHN CORNYN
United States Senator

JC:deg

CC:    The Honorable Mayes Middleton
       Texas State Senate
       2101 Mechanic Street, #245
       Galveston, Texas 77550

When food is heated to too high a temperature, bad things happen:

Healthy components such as vitamin C, B vitamins, and unsaturated fatty acids are destroyed, and some harmful substances are produced, including carcinogens. 120°C: "acrylamide" begins to be produced

Acrylamide is a Class 2A carcinogen recognized by the World Health Organization - with a high likelihood of causing cancer [1].

Simply put, foods containing carbohydrates and amino acids (such as potatoes, bread, steamed buns, etc.) are prone to "Maillard reaction" after being cooked at high temperatures above 120°C.

This reaction can turn food yellow and brown, releasing an attractive aroma, but it can also produce acrylamide.

The darker the color and the stronger the aroma after cooking, the higher the acrylamide content is usually. In other words, burnt steamed buns, bread and other foods contain a large amount of acrylamide.

200°C: "Heterocyclic amines" begin to be produced

Heterocyclic amines will be produced when foods rich in protein and amino acids (such as chicken, beef, pork, fish, etc.) are heated above 200°C.

Studies have found that heterocyclic amines are carcinogenic and mutagenic and are related to cancers such as intestinal cancer, breast cancer, and prostate cancer.

The higher the temperature and the longer the heating time of protein foods, the lower the moisture content, and the more heterocyclic amines are usually produced. 300°C: Begins to produce "benzopyrene"

When the temperature of fat-rich foods, such as plump mutton skewers and fish, exceeds 300°C (for example, when exposed to an open flame, some studies show that it may occur if the temperature exceeds 200°C), the fat in the food will undergo a chemical reaction to form a more Strong carcinogen - polycyclic aromatic hydrocarbons. The most famous of these is benzopyrene.

The "lethality" of benzopyrene is greater than that of heterocyclic amines.

Benzopyrene is classified by the World Health Organization as a Class 1 carcinogen, the highest level —clearly carcinogenic to humans.

The fumes from barbecue are also a source of benzopyrene. The higher the roasting temperature, the more benzopyrene is produced.

https://epaper.ntuh.gov.tw/health/201501/special_1_1.html

https://health.tvbs.com.tw/amp/nutrition/344577

https://www.cancerresearchuk.org/about-cancer/causes-of-cancer/cancer-myths/can-eating-burnt-foods-cause-cancer

https://www.birmingham.ac.uk/research/perspective/does-burnt-food-give-you-cancer.aspx

https://www.ncbi.nlm.nih.gov/books/NBK216648/

https://www.columbiadoctors.org/news/do-grilled-foods-cause-cancer

https://osher.ucsf.edu/patient-care/integrative-medicine-resources/cancer-and-nutrition/faq/animal-protein-cancer-risk

https://www.cancer.gov/about-cancer/causes-prevention/risk/diet/cooked-meats-fact-sheet

60-6 1/84 Exclusions (smoke)

# ALLIED TRUST INSURANCE COMPANY

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# PERSONAL INJURY COVERAGE – TEXAS

## DEFINITIONS

The following definitions are added:

"Personal injury" means injury arising out of one or more of the following offenses, but only if the offense was committed during the policy period:

1. False arrest, detention or imprisonment;

2. Malicious prosecution;

3. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

4. Oral or written publication of material, in any manner, that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

5. Oral or written publication of material, in any manner, that violates a person's right of privacy.

"Fungi" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

However, this does not include any fungi that are, or are contained in, a good or product intended for consumption.

"Electronic Aggression" means:

1. Any use of or the process of using any form or type of, including any supervision of or entrustment with, information technology, communication technology, internet services, mobile technologies or any electronic or communication means, forums or devices used to send or post any oral or written communication or images of any type intended to harm, scare, intimidate, torment, annoy, embarrass, impersonate, stalk, harass, bully, threaten or place under surveillance another person, other persons, group(s) or organization(s);

2. A single incident or a pattern of repeated incidents of 1. Above.

## SECTION II – LIABILITY COVERAGES

## A. Coverage E – Personal Liability

The following is added to **Coverage E – Personal Liability:**

### Personal Injury Coverage

If a claim is made or suit is brought against an "insured" for damages resulting from an offense, defined under "personal injury", to which this coverage applies, we will:

1. Pay up to our limit of liability for the damages for which an "insured" is legally liable. Damages include prejudgment interest awarded against an "insured"; and

2. Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when our limit of liability for the offense has been exhausted by payment of a judgment or settlement.

## SECTION II – EXCLUSIONS

With respect to the coverage provided by this endorsement, **Section II – Exclusions** is replaced by the following:

This insurance does not apply to:

1. "Personal injury":

   a. Caused directly or indirectly, in whole or in part, by or at the direction of an "insured" with the knowledge that the act would violate the rights of another and would inflict "personal injury";

   b. Arising directly or indirectly, in whole or in part, out of oral or written publication of material, if done by or at the direction of an "insured" with knowledge of its falsity;

   c. Arising directly or indirectly, in whole or in part, out of oral or written publication of material whose first publication took place before the beginning of the policy period;

   d. Arising directly or indirectly, in whole or in part, out of the willful violation of a penal statute or ordinance committed by or with the consent of an "insured";

   e. Arising directly or indirectly, in whole or in part, out of liability assumed by an "insured" under any contract or agreement except any indemnity obligation assumed by an "insured" under a written contract directly relating to the ownership, maintenance or use of the premises;

**f.** Sustained by any person as a result of an offense directly or indirectly related to the employment of this person by an "insured";

**g.** Arising directly or indirectly, in whole or in part, out of or in connection with a "business" conducted from an "insured location" or engaged in by an "insured", whether or not the "business" is owned or operated by an "insured" or employs an "insured". This exclusion applies but is not limited to an act or omission, regardless of its nature or circumstance, involving a service or duty rendered, promised, owed, or implied to be provided because of the nature of the "business".

This exclusion does not apply to:

**(1)** The rental or holding for rental of an "insured location";

**(a)** On an occasional basis if used only as a residence;

**(b)** In part for use only `as a residence, unless a single-family unit is intended for use by the occupying family to lodge more than two roomers or boarders; or

**(c)** In part, as an office, school, studio or private garage; and

**(2)** An "insured" under the age of 21 years involved in a part-time or occasional, self-employed "business" with no employees;

**h.** Arising directly or indirectly, in whole or in part, out of civic or public activities performed for pay by an "insured";

**i.** To you or and "insured" as defined under Definition **5.a.** or **5.b.;**

This exclusion also applies to any claim made or suit brought against you or an "insured" to:

**(1)** Repay; or
**(2)** Share damages with;

another person who may be obligated to pay damages because of "personal injury" to an "insured";

**j.** Arising directly or indirectly, in whole or in part, out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.

Waste includes materials to be recycled, reconditioned or reclaimed; or

This exclusion does not apply to any loss caused by:

**1.** Pollutants that escape from heating and air conditioning systems and appliances (HVAC); or

**2.** Common household chemicals used to maintain the residence premises; or

**3.** Pollutants released from a hostile fire.

Hostile fire means a fire that cannot be controlled, escapes from where it was initially set and confined, or was not intended to exist.

**k.** Arising directly or indirectly, in whole or in part, out of the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or microbes.

**l.** Arising directly or indirectly, in whole or in part, out of with any chat rooms; blogs; bulletin boards; gripe sites; electronic social media; or any other electronic forums, including but not limited to harassment or bullying committed by means of an electronic forum, including but not limited to a blog, an electronic bulletin board, an electronic chat room, a gripe site, a social networking site, a website, or a weblog; or by other electronic means, including but not limited to email, instant messaging, or text messaging.

**m.** Because of or originating from or in connection with any "insureds" course of employment whether or not the "occurrence" takes place on the "insured location" or at another location.

**n.** Arising directly or indirectly, in whole or in part, out of any "Electronic Aggression".

This exclusion applies but is not limited to any act or omission, regardless of its nature or circumstance; or whether an "occurrence" takes place on an "insured location" or at any other location; or the number of "insureds" or the number of offenses; or the number of persons injured; or the number of claims made.

**o.** Arising directly or indirectly out of, or in connection with, in whole or in part, with the ownership, maintenance, use, loading, or entrustment to others of any aircraft that is an "unmanned aircraft". Use includes operation and loading or unloading.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by an "insured".

*Page 26-20*

*② Fire-Smoke Coverage*

For purposes of this provision, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment; or

**(6)** Any of the following:

**(a)** Wear and tear, marring, deterioration;

**(b)** Mechanical breakdown, latent defect, inherent vice or any quality in property that causes it to damage or destroy itself;

**(c)** Smog, rust or other corrosion, or dry rot;

**(d)** Smoke from agricultural smudging or industrial operations;

**(e)** Discharge, dispersal, seepage, migration, release or escape of pollutants unless the discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril Insured Against named under Coverage **C**.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed;

**(f)** Settling, shrinking, bulging or expansion, including resultant cracking, of bulkheads, pavements, patios, footings, foundations, walls, floors, roofs or ceilings;

**(g)** Birds, rodents or insects;

**(h)** Nesting or infestation, or discharge or release of waste products or secretions, by any animals; or

**(i)** Animals owned or kept by an "insured".

**Exception To c.(6)**

Unless the loss is otherwise excluded, we cover loss to property covered under Coverage **A** or **B** resulting from an accidental discharge or overflow of water or steam from within a:

**(i)** Storm drain, or water, steam or sewer pipe, off the "residence premises"; or

**(ii)** Plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance on the "residence premises". This includes the cost to tear out and replace any part of a building, or other structure, on the "residence premises", but only when necessary to repair the system or appliance. However, such tear out and replacement coverage only applies to other structures if the water or steam causes actual damage to a building on the "residence premises".

We do not cover loss to the system or appliance from which this water or steam escaped.

For purposes of this provision, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment.

Section I – Exclusion **A.3.** Water, Paragraphs **a.** and **c.** that apply to surface water and water below the surface of the ground do not apply to loss by water covered under **c.(5)** and **(6)** above.

Under **2.b.** and **c.** above, any ensuing loss to property described in Coverages **A** and **B** not precluded by any other provision in this policy is covered.

**B. Coverage C – Personal Property**

We insure for direct physical loss to the property described in Coverage **C** caused by any of the following perils unless the loss is excluded in Section I – Exclusions.

**1. Fire Or Lightning**

**2. Windstorm Or Hail**

This peril includes loss to watercraft of all types and their trailers, furnishings, equipment, and outboard engines or motors, only while inside a fully enclosed building.

This peril does not include loss to the property contained in a building caused by rain, snow, sleet, sand or dust unless the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening.

**3. Explosion**

**4. Riot Or Civil Commotion**

**5. Aircraft**

This peril includes self-propelled missiles and spacecraft.

**6. Vehicles**

**7. Smoke**

This peril means sudden and accidental damage from smoke, including the emission or puffback of smoke, soot, fumes or vapors from a boiler, furnace or related equipment.

This peril does not include loss caused by smoke from agricultural smudging or industrial operations.

**8. Vandalism Or Malicious Mischief**

**9. Theft**

a. This peril includes attempted theft and loss of property from a known place when it is likely that the property has been stolen.

b. This peril does not include loss caused by theft:

(1) Committed by an "insured";

(2) In or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied;

(3) From that part of a "residence premises" rented by an "insured" to someone other than another "insured"; or

(4) That occurs off the "residence premises" of:

(a) Trailers, semitrailers and campers;

(b) Watercraft of all types, and their furnishings, equipment and outboard engines or motors; or

(c) Property while at any other residence owned by, rented to, or occupied by an "insured", except while an "insured" is temporarily living there. Property of an "insured" who is a student is covered while at the residence the student occupies to attend school as long as the student has been there at any time during the 90 days immediately before the loss.

**10. Falling Objects**

This peril does not include loss to property contained in a building unless the roof or an outside wall of the building is first damaged by a falling object. Damage to the falling object itself is not included.

**11. Weight Of Ice, Snow Or Sleet**

This peril means weight of ice, snow or sleet which causes damage to property contained in a building.

**12. Accidental Discharge Or Overflow Of Water Or Steam**

a. This peril means accidental discharge or overflow of water or steam from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance.

b. This peril does not include loss:

(1) To the system or appliance from which the water or steam escaped;

(2) Caused by or resulting from freezing except as provided in Peril Insured Against **14.** Freezing;

(3) On the "residence premises" caused by accidental discharge or overflow which occurs off the "residence premises"; or

(4) Caused by mold, fungus or wet rot unless hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure.

c. In this peril, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment.

d. Section I – Exclusion **A.3.** Water, Paragraphs **a.** and **c.** that apply to surface water and water below the surface of the ground do not apply to loss by water covered under this peril.

**13. Sudden And Accidental Tearing Apart, Cracking, Burning Or Bulging**

This peril means sudden and accidental tearing apart, cracking, burning or bulging of a steam or hot water heating system, an air conditioning or automatic fire protective sprinkler system, or an appliance for heating water.

We do not cover loss caused by or resulting from freezing under this peril.

Page 61

D) Additional Living Expenses

g. Property in an apartment regularly rented or held for rental to others by an "insured", except as provided in **E.10.** Landlord's Furnishings under Section I – Property Coverages;

h. Property rented or held for rental to others off the "residence premises";

i. "Business" data, including such data stored in:

(1) Books of account, drawings or other paper records; or

(2) Computers and related equipment.

We do cover the cost of blank recording or storage media and of prerecorded computer programs available on the retail market;

j. Credit cards, electronic fund transfer cards or access devices used solely for deposit, withdrawal or transfer of funds except as provided in **E.6.** Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money under Section I – Property Coverages; or

k. Water or steam.

## D. Coverage D – Loss Of Use

The limit of liability for Coverage **D** is the total limit for the coverages in **1.** Additional Living Expense, **2.** Fair Rental Value and **3.** Civil Authority Prohibits Use below.

### 1. Additional Living Expense

If a loss covered under Section I makes that part of the "residence premises" where you reside not fit to live in, we cover any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living.

Payment will be for the shortest time required to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere.

### 2. Fair Rental Value

If a loss covered under Section I makes that part of the "residence premises" rented to others or held for rental by you not fit to live in, we cover the fair rental value of such premises less any expenses that do not continue while it is not fit to live in.

Payment will be for the shortest time required to repair or replace such premises.

### 3. Civil Authority Prohibits Use

If a civil authority prohibits you from use of the "residence premises" as a result of direct damage to neighboring premises by a Peril Insured Against, we cover the loss as provided in **1.** Additional Living Expense and **2.** Fair Rental Value above for no more than two weeks.

### 4. Loss Or Expense Not Covered

We do not cover loss or expense due to cancellation of a lease or agreement.

The periods of time under **1.** Additional Living Expense, **2.** Fair Rental Value and **3.** Civil Authority Prohibits Use above are not limited by expiration of this policy.

## E. Additional Coverages

### 1. Debris Removal

a. We will pay your reasonable expense for the removal of:

(1) Debris of covered property if a Peril Insured Against that applies to the damaged property causes the loss; or

(2) Ash, dust or particles from a volcanic eruption that has caused direct loss to a building or property contained in a building.

This expense is included in the limit of liability that applies to the damaged property. If the amount to be paid for the actual damage to the property plus the debris removal expense is more than the limit of liability for the damaged property, an additional 5% of that limit is available for such expense.

b. We will also pay your reasonable expense, up to $1,000, for the removal from the "residence premises" of:

(1) Your trees felled by the peril of Windstorm or Hail or Weight of Ice, Snow or Sleet; or

(2) A neighbor's trees felled by a Peril Insured Against under Coverage **C;**

provided the trees:

(3) Damage a covered structure; or

(4) Do not damage a covered structure, but:

(a) Block a driveway on the "residence premises" which prevents a "motor vehicle", that is registered for use on public roads or property, from entering or leaving the "residence premises"; or

## C. Duties After Loss

In case of a loss to covered property, we have no duty to provide coverage under this policy if the failure to comply with the following duties is prejudicial to us. These duties must be performed either by you, an "insured" seeking coverage, or a representative of either:

1. Give prompt notice to us or our agent;

2. Notify the police in case of loss by theft;

3. Notify the credit card or electronic fund transfer card or access device company in case of loss as provided for in **E.6.** Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money under Section I – Property Coverages;

4. Protect the property from further damage. If repairs to the property are required, you must:

   a. Make reasonable and necessary repairs to protect the property; and

   b. Keep an accurate record of repair expenses;

5. Cooperate with us in the investigation of a claim;

6. Prepare an inventory of damaged personal property showing the quantity, description, actual cash value and amount of loss. Attach all bills, receipts and related documents that justify the figures in the inventory;

7. As often as we reasonably require:

   a. Show the damaged property;

   b. Provide us with records and documents we request and permit us to make copies; and

   c. Submit to examination under oath, while not in the presence of another "insured", and sign the same;

8. Send to us, within 60 days after our request, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:

   a. The time and cause of loss;

   b. The interests of all "insureds" and all others in the property involved and all liens on the property;

   c. Other insurance which may cover the loss;

   d. Changes in title or occupancy of the property during the term of the policy;

   e. Specifications of damaged buildings and detailed repair estimates;

   f. The inventory of damaged personal property described in **6.** above;

   g. Receipts for additional living expenses incurred and records that support the fair rental value loss; and

   h. Evidence or affidavit that supports a claim under **E.6.** Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money under Section I – Property Coverages, stating the amount and cause of loss.

## D. Loss Settlement

In this Condition **D.,** the terms "cost to repair or replace" and "replacement cost" do not include the increased costs incurred to comply with the enforcement of any ordinance or law, except to the extent that coverage for these increased costs is provided in **E.11.** Ordinance Or Law under Section I – Property Coverages. Covered property losses are settled as follows:

1. Property of the following types:

   a. Personal property;

   b. Awnings, carpeting, household appliances, outdoor antennas and outdoor equipment, whether or not attached to buildings;

   c. Structures that are not buildings; and

   d. Grave markers, including mausoleums;

   at actual cash value at the time of loss but not more than the amount required to repair or replace.

2. Buildings covered under Coverage **A** or **B** at replacement cost without deduction for depreciation, subject to the following:

   a. If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, without deduction for depreciation, but not more than the least of the following amounts:

      (1) The limit of liability under this policy that applies to the building;

      (2) The replacement cost of that part of the building damaged with material of like kind and quality and for like use; or

      (3) The necessary amount actually spent to repair or replace the damaged building.

      If the building is rebuilt at a new premises, the cost described in **(2)** above is limited to the cost which would have been incurred if the building had been built at the original premises.





9/27/2023

### KEN PAXTON
ATTORNEY GENERAL OF TEXAS

## Consumer's Information Summary

| | | | |
|---|---|---|---|
| **Individual/Business** | Individual | **Address 1** | 7919 Quartz Ln, Texas city |
| **First Name** | Di | **Address 2** | |
| **Middle Name** | | **City** | Houston |
| **Last Name** | Wang | **County** | Galveston |
| **Age** | 50-59 | **State** | TX |
| **Doing Business As** | Trading | **Zip/Postal Code** | 77591 |
| | | **Country** | United States |

| | |
|---|---|
| **Primary Phone** | (281) 818-8120 |
| **Extension** | |
| **Secondary Phone** | (832) 523-5003 |
| **Extension** | |

| | |
|---|---|
| **Email** | jts990616@gmail.com |

## Business'/Individual's Information Summary

| | | | |
|---|---|---|---|
| **Business/Individual** | Business | **Address 1** | 11111 Katy Fwy ste450 |
| **Business Name** | Firemark insurance agency | **Address 2** | |
| | | **City** | Houston |
| **Phone** | (281) 293-0601 | **County** | Harris |
| **Extension** | | **State** | TX |
| | | **Zip/Postal Code** | 77079 |
| | | **Country** | United States |

| | |
|---|---|
| **Website** | http://www.Firemarkinsuranceagency.com |
| **Email** | charliew@firemarkinsuranceagency.com |



## KEN PAXTON
ATTORNEY GENERAL OF TEXAS

| If yes, please list name and address of the agency or attorney? | Allison Eberhart from TDI<br>Orlando Hernandez from State Fire Marshal<br>Cassie Brown from TDI<br>Kenisha Schuster from TDI<br>Marie Dahlmann from Texas Governor office<br>Greg Abott from Texas Government<br>Dan Patrick from Texas Government<br>(512)4754413 Complain about malfeasance in government department but the old guy asked us don't call TDI again because our case is based of Florida insurance company. |
|---|---|
| **What action was taken by this agency or attorney?** | Nothing!<br>The guy named Keitha McKinney said she would transfer my email at all,and she said Mr Charles Reyna is w/o on our case,but we don't know who is that. |

THP-89 (05/23)

# Texas Department of Public Safety

### Trespass Notice / Notice to Depart

Trooper: _A. Sanchez #110457_
Case/Call#: _TX 24-127195_
Date: _1/29/2024_

### Subject:

Name: _Houhe Zeng_
Address: _919 Quartz LN Texas City, Texas_
Phone: _(832) 523-5003_

You are hereby given notice that you are forbidden to return to and enter the property described below. This includes any grounds, drives, parking areas, yards, vehicles, sidewalks, or other properties attached to the below address. Your entry at the property will constitute a violation of Texas Penal Code, Section 30.05 (a)(1)(A).

### Trespassed Property/Address:

Address: _1100 S. Congress Ave_
City, State, Zip: _Austin, Texas 78701_

which is described as *(physical description of property, if applicable):*
_Texas State Capitol Building / Texas State Capitol_
_Grounds_

This notice is effective from the above date for a period of:
_1/29/2024 ~ 1/29/2025_

### Complainant Contact Information

Complainant/Business Name: _Texas State Capitol_
Complainant/Business Address: _1100 S. Congress Ave Austin_
Complainant/Business Phone #: _Texas 78701_

Compliment or Complaint?
To Provide a Compliment, Contact:
CustomerComments@dps.texas.gov or (512) 424-2823
To File a Personnel Complaint, Contact:
Texas Department of Public Safety - Office of Inspector General
PO Box 4087; Austin, TX 78773
InspectorGeneral@dps.texas.gov or (512) 424-5017 (Mon-Fri, 8AM-5PM)
For detailed personnel complaint information, visit:
http://www.dps.texas.gov/section/office-inspector-general

# TEXAS TORT CLAIMS ACT BASICS

德州侵权索赔法基本知识

TMLI RP

(800)5316655

TMLRiskpool@tmlirp.org

PO Box 149194

Austin, TX 78714

**Dick Evans, TMLIRP**
**Lori Gillespie, TMLIRP** 律所

**William M. McKamie**
**McKamie Krueger, LLP**

**Laura Mueller**
**Assistant General Counsel**
**Texas Municipal League**

（德州市政联盟助理总法律顾问）

1989年基金更名德州市政联盟改府间风险池

① intergrity 诚信  ④ Operational Excellence 操作效率

② public service 公共服务

Legal responsibility 财政责任

i

Tort Claims Act Basics

# Table of Contents

Introduction .......................................................................... 1

I. BACKGROUND AND HISTORY ......................................... 1

II. GOVERNMENTAL FUNCTIONS v. PROPRIETARY FUNCTIONS:  CITY LIABILITY UNDER THE ACT ....................................................

III. WAIVER OF IMMUNITY ............................................... 3

    A.    Generally .................................................................. 3
    B.    Condition of Real Property .......................................... 3
    1.    Premise Defects—Statutory Duty ................................. 4
    2.    Standard of Care—Invitee .......................................... 5
    3.    Standard of Care—Licensee ........................................ 6
    4.    Standard of Care—Trespassers ..................................... 6
    5.    Special Defects ......................................................... 6
    6.    Recreation Facilities ................................................... 7
    C.    Condition or Use of Tangible Personal Property .............. 8
    1.    Tangible Property ...................................................... 9
    2.    Use of Property ........................................................ 10
    D.    Use of Motor-Driven Vehicle and Equipment ................. 11
    E.    Joint Enterprise ........................................................ 12

IV. EXEMPTIONS AND EXCEPTIONS FROM THE WAIVER OF IMMUNITY ........... 13 ... 14
    A.    Exceptions to Waiver of Immunity ............................... 14
    B.    Specific Exceptions and Exemptions .............................. 15
    1.    Discretionary Acts.   Texas Civil Practices & Remedies Code § 101.056 ........... 15
    2.    Method for Providing Police/Fire Protection—Texas Civil Practices & Remedies Code § 101.055(3) ...............................................................
    3.    Intentional Tort—Texas Civil Practices & Remedies Code § 101.057 ........... 15
    4.    Traffic Signs, Signals, and Warning Devices— Texas Civil Practices & Remedies Code § 101.060 .......................................................
    C.    Plea to the Jurisdiction ............................................... 15

V. INDIVIDUAL IMMUNITY FROM LIABILITY ........................ 16 ... 16

VI. DAMAGES ................................................................... 18
    A.    Statutory Limits ....................................................... 18
    B.    Damages .................................................................. 18

VII. MISCELLANEOUS MATTERS ......................................... 19 ... 19
    A.    Notice of Claim ........................................................ 19
    B.    Payment of Award against Employee ............................ 20
    C.    Insurance ................................................................. 20
    D.    Representation .......................................................... 21

Tort Claims Act Basics

APPENDIX .................................................................................................... 1

    Appendix:  Legal Q & A for Government Officials and Clients ....................................... 1